# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JOANN SUCHARSKI**
        **Plaintiff,**

        **v.**                                                        **Case No. 08-C-0284**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Joann Sucharski worked as a nurse at Froedert Memorial Hospital from 1986 to 1998. In 1996, plaintiff's doctors tentatively diagnosed her with MS, which was confirmed by testing in 1998. She nevertheless continued to work. However, in June of 1998, plaintiff injured her neck lifting a patient, forcing her to miss work beginning in September. (Tr. at 40; 171; 326; 367-70.) Diagnosed with herniated discs at the C5-6 and C6-7 levels, she underwent cervical spinal fusion surgery in April 1999 and subsequent physical therapy, which resulted in some improvement. (Tr. at 362-64; 371; 424-25; 523-24; 895.) Dr. Diane Braza of the Spine Care Clinic concluded that plaintiff reached an end of healing related to the neck injury in September 1999, releasing her with permanent light duty restrictions. (Tr. at 388-90; 494-502.) However, following an October 1998 flare-up of her MS, plaintiff never returned to work on a full-time basis, due primarily to fatigue. (Tr. at 270; 407; 526; 540.)

In August of 2001, plaintiff applied for social security disability benefits, alleging inability to work on a full-time basis after September 15, 1998 (later amended to October

15, 1998).[1]  (Tr. at 119; 170.)  The Social Security Administration ("SSA") denied the application on initial review in February 2002 (Tr. at 74) and on plaintiff's request for reconsideration in August 2002 (Tr. at 76).  On October 22, 2002, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on her application.  (Tr. at 87.)

In December 2002, while she awaited her hearing date, plaintiff returned to work at Children's Hospital on a part-time basis as a nurse in the poison control center.  (Tr. at 39; 1246.)  Although this was part-time work, plaintiff's earnings were sufficient to disallow continued disability benefits under SSA income guidelines.  Nevertheless, she argued that there had been no medical improvement in her condition, and that the ALJ should find her entitled to a nine month "trial work period" following her December 2002 return to work.  (Tr. at 36-37; 1232.)

In a decision dated July 30, 2004, the ALJ denied plaintiff's claim, finding her not disabled at any time through the date of the decision.  (Tr. at 19-30; 964-75).  Specifically, the ALJ found plaintiff ineligible for benefits after December 1, 2002, based on her return to gainful employment, and that she was capable of work for the period of October 15, 1998 through December 1, 2002.  (Tr. at 29-30.)  The Appeals Council denied plaintiff's request for review (Tr. at 8), but another judge of this district reversed and remanded the matter for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four (Tr. at 979-1010; see also Tr. at 976).

---

[1]Plaintiff filed a previous application in 1999, which the SSA denied.  (Tr. at 109-18.) During the proceedings on the instant application, plaintiff requested that the 1999 application be re-opened.  (Tr. at 870.)  The ALJ impliedly granted that request by considering disability back to September 1998.  (Tr. at 1180.)

2

On remand, the same ALJ again denied the claim in a decision dated November 13, 2007. (Tr. at 1169-81.) Although she modified some of her specific reasons for rejecting certain evidence, the ALJ re-affirmed her basic findings: that plaintiff returned to gainful work after December 2002, and that she was able to work from October 1998 to December 2002. The Appeals Council again denied review (Tr. at 942A; 1194), and plaintiff again filed an action under § 405(g), which was assigned to me. On June 9, 2008, I remanded the matter under § 405(g), sentence six, because the Commissioner lost the CD of the hearing testimony. (Tr. at 1182-87.) The Commissioner set the matter for a new hearing but then found the CD (Tr. at 1198-1200), and I re-opened the case and ordered briefs on the merits.

Plaintiff concedes that she is no longer eligible for benefits because she returned to work (part-time, but with earnings sufficient to disallow benefits) in December 2002. She argues that the ALJ erred in finding her not disabled from October 15, 1998 through December 2002, and in failing to grant her a trial work period of nine months from January through September 2003, with benefits terminating after November 2003 under SSA regulations. In support of these contentions, plaintiff challenges the ALJ's evaluation of the medical opinions from treating and examining physicians, the credibility of the hearing testimony, and plaintiff's mental ability for work during the 1998 to 2002 period. On review of the entire record, I conclude that the ALJ erred in finding plaintiff not disabled during the 1998 to 2002 period, and that the matter should be remanded for an award of benefits during that time and for application of the trial work period regulation thereafter.

3

# I. APPLICABLE LEGAL STANDARDS

## A.    Judicial Review

The court reviews an ALJ's decision to ensure that it is supported by "substantial evidence" and consistent with applicable law.  Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009); Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion.  Terry v. Astrue, No. 09-1045, 2009 WL 2634418, at *4 (7th Cir. Aug. 28, 2009).  Thus, where conflicting evidence would allow reasonable people to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ.  Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).  A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ.  Id.

However, this does not mean that the court acts as an "uncritical rubberstamp."  Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1983).   In determining whether substantial evidence exists, the court reviews the entire record, taking into account both the evidence in support of the ALJ's conclusion and anything that fairly detracts from its weight.  Young v. Sec'y of Health and Human Services, 957 F.2d 386, 388-89 (7th Cir. 1992).  The court cannot uphold a decision that lacks evidentiary support, ignores important evidence, or fails to build an accurate and logical bridge from the evidence to the result.  See, e.g., Hopgood ex rel. L.G. v. Astrue, No. 08-2491, 2009 WL 2591354, at *2 (7th Cir. Aug. 25, 2009); Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009); Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003); Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).  Further, if the ALJ commits an error of law, such

4

as violating agency rules for evaluating disability claims, see Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991), the court "may reverse without regard to the volume of evidence in support of the factual findings." White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999).

If the court finds error, § 405(g) permits the court to enter a judgment modifying or reversing the ALJ's decision with or without remanding the case for rehearing. When the court finds the ALJ's decision unsupported by substantial evidence, or insufficiently explained, the appropriate remedy is generally remand for further proceedings. See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 355 (7th Cir. 2005); Foster v. Astrue, 548 F. Supp. 2d 667, 672 (E.D. Wis. 2008). However, if the factual issues have been resolved and the evidence clearly supports an award of benefits, the court may order the SSA to grant the application. Briscoe, 425 F.3d at 355 (citing Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993)); Foster, 548 F. Supp. 2d at 672; see also Wilder v. Apfel, 153 F.3d 799, 804 (7th Cir. 1998) (awarding benefits where, on sentence four remand, the ALJ ignored the law of the case and received no new evidence, leaving "the case exactly where it was the last time: with no reasoned basis for the denial of benefits").

**B.  Disability Standard**

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). Under this test, the ALJ first determines whether the claimant is engaged in substantial gainful activity ("SGA"). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work activity done "for pay or profit." 20 C.F.R. § 404.1572(b). SSA regulations set forth income guidelines for determining whether work constitutes SGA, and under these standards even part-time work may constitute SGA. See

5

20 C.F.R. § 404.1574. If a claimant is engaged in SGA, she will be found not disabled regardless of her medical condition. However, the regulations permit a disabled claimant to engage in a "trial work period," during which she may test her ability to work and still be considered disabled. Generally, such periods may last up to nine months. See 20 C.F.R. § 404.1592.

If the claimant is not engaged in SGA, the ALJ must decide at step two whether the claimant has a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the ALJ finds severe impairments, she next decides at step three whether any of the claimant's impairments are listed by the SSA as being presumptively disabling. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").

If none of the impairments meet or equal a Listing, the ALJ determines at step four whether the claimant possesses the residual functional capacity ("RFC") to perform her past work. RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p. Finally, if the ALJ finds that the claimant cannot return to past work, she must decide at step five whether the claimant can make the transition to other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant carries the burden of proof at steps one through four, but if she reaches step five the burden shifts to the SSA to establish that the claimant is capable of performing other work. Briscoe, 425 F.3d at 352; Young v. Barnhart, 362 F.3d 995, 1000

6

(7th Cir. 2004). The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines" (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid and must consult a VE if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work, although she may use the Grid as a "framework" for her decision. E.g., Masch v. Barnhart, 406 F. Supp. 2d 1038, 1041-42 (E.D. Wis. 2005).

## II. FACTS

**A. Medical Evidence**

**1. Treating and Examining Sources**

As indicated above, plaintiff injured her neck in 1998, resulting in her initial absence from work. However, plaintiff substantially recovered from her neck injury, and she bases her social security claim primarily on her MS. I therefore focus on the records related to that condition.

In September 1996, plaintiff saw neurologist L. Cass Terry, complaining of dizziness, blurred vision, and a period of numbness and tingling along the left side of the body and in both feet, along with severe fatigue. Dr. Terry suspected demyelinative disease, i.e. multiple sclerosis. (Tr. at 448.) Subsequent testing and examination in 1998 confirmed the diagnosis. (Tr. at 449; 452; 619-20) On October 20, 1998, Dr. Terry wrote that "it is clear now that the diagnosis is multiple sclerosis." (Tr. at 616.) At that time, plaintiff presented

7

with a primary complaint of fatigue, along with significant depression. Dr. Terry indicated that because of the severe fatigue from the MS , as well as neck pain secondary to her herniated discs, plaintiff was unable to work full-time. Indeed, plaintiff was at the time unable to work even three to four hours per day, so Dr. Terry excused her from work entirely. (Tr. at 616.)

On October 26, 1998, plaintiff underwent an evaluation by Dr. Marc Novom at the behest of her employer's workers compensation insurance carrier. (Tr. at 446.) Dr. Novom opined that plaintiff had reached an end of healing regarding her work-related neck injury, but concluded that she was unable to return to work in the immediate foreseeable future due to a flare-up of her MS and concomitant depression. (Tr. at 455-56.) Although Dr. Novom advised caution in projecting a long-term outlook for a person of plaintiff's age with MS, he stated that "there is good reason to be concerned Ms. Sucharski may not return to normal baseline neurologic function." (Tr. at 456.)

Plaintiff saw Dr. Terry on November 4, 1998, complaining of headache and left eye pain, dizziness with some vertigo, and fatigue. Dr. Terry found plaintiff to be in an exacerbation of her remitting/relapsing MS, and ordered a three day course of intravenous steroids. (Tr. at 613; 713-17.) Following this treatment, Dr. Terry found plaintiff to be doing much better on re-check on November 10, with improved walking and decreased fatigue. (Tr. at 612.)

Plaintiff returned to Dr. Terry on January 27, 1999, reporting less fatigue and no other neurological complaints. She did complain of right arm weakness and numbness, and Dr. Terry was unclear whether this symptom related to plaintiff's neck or was

8

secondary to her MS. On examination, Dr. Terry noted some spasticity and hyperreflexia in the lower extremities. (Tr. at 416; 608.)

On March 2, 1999, plaintiff saw neuro-psychologist Sara Swanson for an evaluation of her higher cognitive functioning. Plaintiff reported trouble with reading comprehension, word finding and articulation, as well as depression and anxiety related to her MS symptoms. (Tr. at 407-08.) Dr. Swanson found plaintiff to be functioning in the high-average range on measures of intelligence, language and memory, and the test data did not support her cognitive complaints. However, Dr. Swanson noted that mild declines were difficult to detect in high functioning individuals. (Tr. at 409-10.) Overall, Dr. Swanson found plaintiff to be functioning well cognitively, but she did recommend psycho-therapy and pharmaco-therapy for depression. (Tr. at 410.)

On April 27, 1999, following plaintiff's cervical fusion, Dr. Novom provided another report, opining that plaintiff was temporarily totally disabled from work following her surgery. He suggested possible permanent restrictions but stated that plaintiff "may require even greater . . . restrictions at work depending on the status of the underlying multiple sclerosis." (Tr. at 395.)

Plaintiff returned to Dr. Terry on April 27, 1999, indicating that her neck problems improved after the surgery but complaining of transient visual symptoms in the right eye, as well as significant fatigue. (Tr. at 598.) On May 17, plaintiff saw Dr. Eric Mass for a neuro-opthamologic review related to her complaints of eye discomfort and blurring. On exam, she was back to baseline. (Tr. at 596-97.)

Plaintiff returned to Dr. Terry on October 19, 1999, having been cleared by Dr. Braza to return to full-time, light duty work but feeling that she "can't make it past 6 hours."

9

Nevertheless, she expressed a desire to return to work and stated that her fatigue was greatly improved. On exam, Dr. Terry found her relatively stable and unchanged. (Tr. at 589.)

On November 22, 1999, plaintiff underwent a 2 ½ hour functional capacity evaluation ("FCE") on referral from her primary care physician, Dr. Joan Milott. The evaluation, conducted by an occupational therapist, generally reflected an ability for light work, i.e. lifting 15-20 pounds occasionally, 5-8 pounds frequently, with regular postural changes and only occasional crouching/kneeling. (Tr. at 747-57.)

Plaintiff returned to Dr. Terry on November 30, 1999, complaining of twitching in the upper extremities, headaches, balance problems, decreased vision in the right eye, and weakness and pain in the right arm. On exam, Dr. Terry noted "clear cut evidence of upper motor-neuron weakness in the left lower extremity." (Tr. at 588.) The rest of her exam was unchanged. (Tr. at 588.)

On December 1, 1999, plaintiff underwent a physical with Dr. Milott in order to be cleared as a foster parent, as she had recently taken in a relative's two children, ages six and twelve. Dr. Milott found no reason plaintiff could not care for the children. (Tr. at 292.)

Plaintiff returned to Dr. Terry on February 1, 2000, having recently undergone another intravenous steroid burst. She reported "recovering somewhat" from her MS symptoms but continued to experience leg fatigue. She reported having more energy but fatigued easily. (Tr. at 584.) On April 4, plaintiff reported improved spasticity but complained of some trouble with her right eye. Her clinical exam was unchanged. Plaintiff indicated that she was about to start graduate courses and expressed a desire to do volunteer MS work in the neurology department. (Tr. at 583.) On June 1, plaintiff reported

10

doing relatively well, but with some lower extremity pain radiating into the legs and continued fatigue due to MS. (Tr. at 582.) On August 29, Dr. Terry advised plaintiff to consider reducing her academic load because of fatigue. Plaintiff believed that her legs were getting weaker, and complained of extreme heat intolerance and labile mood at times, especially when her medications wore off. On exam, Dr. Terry found no change in her neurological status. (Tr. at 581.)

On October 31, 2000, plaintiff complained of migraine headaches, upper extremity weakness bilaterally, increasing weakness in her left leg, fatigue and some shortness of breath, and extreme heat intolerance. Dr. Terry noted that plaintiff experienced some relief following a course of steroids several months ago, but she continued "to show slow progression of her MS symptoms." (Tr. at 580.) On December 19, plaintiff reported no new symptoms aside from occasional dimness in the left eye lasting one to two hours. Overall, she was doing very well, but with mild to moderate fatigue. Her neurological exam was unchanged. (Tr. at 579.)

On January 24, 2001, plaintiff returned to Dr. Terry complaining of increasing fatigue after only mild exertion and significant short term memory problems. Dr. Terry ordered another MRI and repeat neuro-psychological testing. (Tr. at 574.) On her May 15 re-check, plaintiff complained of swelling in her lower extremities, along with paresthesias and pain in her lower extremities. She also complained of increased word finding problems, decreased short-term memory, and spasms to the hands. On exam, she appeared quite swollen in the abdominal area and the legs. (Tr. at 575.)

On June 6, 2001, Dr. Novom re-evaluated plaintiff, this time in connection with her application for long-term disability benefits. (Tr. at 819.) Plaintiff complained of fatigue,

11

spasticity of the lower extremities with significant weakness and modest weakness of the upper extremities, daily low back pain, double vision with fatigue, neck soreness and stiffness daily, migraines five times per month, reduced memory and work-finding problems, and chronic depression. (Tr. at 819-20). Dr. Novom's impression was that plaintiff suffered from progressive MS evidenced by increased burden of demyelinative changes seen on combined brain and spinal chord MRIs, clinically manifested by spastic paraperesis; great fatigue; complaints of diplopia; reduced limb strength; and higher cognitive disturbances of impaired memory and word-finding difficulty. He stated that her prognosis overall was fair to poor. (Tr. at 822.) He indicated that her greatest complaint was fatigue, and that "there is without doubt genuine organic basis for such complaint owing to central nervous system demyelinative disease." (Tr. at 823.) He found that her other complaints all drew direct relation to MS. Regarding her limitations, Dr. Novom opined that plaintiff had limited stamina and alertness beyond a four hour period without taking necessary rest. She had intermittent vision problems, which would interfere with performing tasks requiring close visual attention. She was unable to walk for any length or climb ladders or stairs. She was unable to perform fine distal coordinated activities of the hands. She could not sit for any length due to neck and back pain, or work overhead or bend very readily. (Tr. at 823.) Dr. Novom concluded:

> It is my medical opinion Ms. Sucharski is more disabled/impaired than which she is presently willing to admit. Though Ms. Sucharski in most commendable fashion expresses great interest in returning to some variety of work estimating being able to lift or carry as much as 25 lb. I find such projection unrealistic. I remain skeptical Ms. Sucharski will be able to return to any variety of gainful employ without frequent interruption due to exacerbation or worsening of demyelinative disease. Having said as much, I find no objection to this woman attempting return to work not exceeding four

12

hours per day abiding by certain restrictions including confinement to mostly sedentary work[.]

(Tr. at 823-24.)

Dr. Swanson re-evaluated plaintiff on December 7, 2001, noting that an MRI completed on November 19, 2001, revealed two new lesions in the periventricular white matter, as compared to a previous scan from April 22, 1999. (Tr. at 719; 768; 785.) Plaintiff stated that since June 2000 she had difficulty staying awake and needed to nap every two hours. She also reported experiencing double or blurred vision, lasting from thirty minutes to two hours, and some difficulty walking resulting from severe sciatic pain. (Tr. at 719.) Plaintiff indicated that she had started graduate school in April 2000 but quit in May 2001 due to frustration with her inability to retain information. She stated that she often avoided social conversation due to word-finding difficulties and speech hesitancy, and complained of difficulty remembering things. (Tr. at 720.)

Dr. Swanson observed no word finding problems or memory deficits. Testing revealed slight declines on span memory measures of attention and manual dexterity as compared to the March 1999 results, but plaintiff's intellectual abilities remained in the high average range overall. Performance on tasks that are sensitive to cognitive changes in MS (sustained attention, mental processing speed, executive functioning and memory) had remained stable since March 1999. (Tr. at 721.) Overall, Dr. Swanson found that the testing showed relatively little cognitive change and some improvement in emotional symptoms. Manual dexterity did decline from average to low average bilaterally, which may represent a progression of the MS. (Tr. at 721-22.) Dr. Swanson noted plaintiff's desire

13

to begin working again but recommended part-time work in a low stress position.  (Tr. at 722.)[2]

Plaintiff returned to Dr. Terry on December 19, 2001 and reported doing well overall. (Tr. at 781.)  On February 19, 2002, she reported being relatively stable but with increasing fatigue over the past month.  She also complained of spasticity, which kept her awake at night.  (Tr. at 791.)  On June 11, plaintiff complained of increasing weakness in her upper extremities, pain in her arms, difficulty lifting things and brushing her hair.  She also complained of pain in her legs and low back, increasing fatigue, and intermittent blurred vision.  Neurologic exam revealed some increasing upper motor neuron weakness in the upper extremities.  (Tr. at 789.)  In November 2002, plaintiff saw Dr. Bernd Remler for her vision problems.  (Tr. at 845.)

On February 19, 2003, plaintiff returned to Dr. Terry, doing quite well, with little fatigue.  She reported having returned to work part-time at Children's Hospital. Nevertheless, Dr. Terry cautioned:

> She still has her multiple sclerosis and the transient and neurologic symptoms that go along with it.  She is relatively stable for the time being. Most of the time was spent going over her activities on the job and some complaints she had of transient neurological problems that would come and go.  Overall she is doing well and seems to be quite happy.  I will see her back in routine follow up in three months.

(Tr. at 840.)

---

[2]On May 1, 2002, following a contact with plaintiff, Dr. Swanson prepared an addendum stating: "We both agreed that her pain and fatigue may be disabling irrespective of the results of cognitive testing.  The degree to which she is disabled due to physical problems, fatigue, and pain would need to be documented by her neurologist, Dr. L. Cass Terry, MD, PhD."  (Tr. at 736.)

14

On May 20, 2003, Dr. Terry provided a statement indicating that plaintiff could work up to two days in a row, no more than a total of 2 ½ days per week.  Plaintiff complained of fatigue after working two consecutive days but was otherwise doing quite well.  (Tr. at 836-37.)

On October 31, 2003, plaintiff began seeing Dr. Adriana Kori-Graf of the Froedert Neurology Department.  (Tr. at 832-33.)  On November 6, 2003, Dr. Kori-Graf completed an MS RFC questionnaire, describing plaintiff's symptoms as fatigue, balance problems, weakness, spasticity, numbness and bladder problems.  (Tr. at 815.)  Dr. Kori-Graf opined that plaintiff could walk two blocks; continuously sit five minutes to one hour and stand for ten minutes; stand/walk a total of about two hours and sit about four hours in an eight hour day; required a job that permitted her to shift positions at will; and required one sixty minute break per day, during which she could lie down.  (Tr. at 816.)  Dr. Kori-Graf further opined that plaintiff could occasionally lift ten pounds, occasionally climb ladders or stairs, and would miss more than four days per month due to her impairment.  (Tr. at 818.)

On February 27, 2004, plaintiff saw Dr. Alexandru Barboi of the Froedert Neurology Department.  After reviewing plaintiff's medical history, Dr. Barboi stated: "It is remarkable that Mrs. Joanne Sucharski combines so many neurological problems."  (Tr. at 1071.)

On April 4, 2004, Dr. Terry prepared a letter report, indicating that ever since her MS exacerbation in October 1998 plaintiff experienced moderate to severe fatigue with brief episodes of mild to moderate fatigue.  She eased back into part-time work but "was never able to tolerate a full 40 hour per week position at any form of employment."  (Tr. at 873.)  Dr. Terry also noted varying degrees of weakness and short-term memory problems that limited her type and duration of work, as well as small exacerbations caused by neuro-

15

opthalmologic problems.  Dr. Terry concluded that plaintiff initially presented with relapsing/remitting MS, wherein between exacerbations she was relatively normal, but she later converted to progressive MS, manifested by a continuous downhill course with increasing symptoms including fatigue and cognitive problems that prevented her from working for any degree of time.  Dr. Terry concluded, based on five years as plaintiff's treating neurologist, that plaintiff was unable to work full-time at any job since October 1998.  (Tr. at 873.)[3]

### 2. State Agency Consultants

On February 19, 2002, state agency consultant Dr. Robert Callear completed a physical RFC report, finding plaintiff capable of light work, with occasional stooping, kneeling and crouching, and limited overhead reaching.  (Tr. at 792-99.)  Another consultant, Dr. Pat Chan, reviewed and affirmed this assessment on August 26, 2002.  (Tr. at 799.)

On February 21, 2002, Anthony Matkom, PhD., completed a psychiatric review technique form ("PRTF"), finding that plaintiff had no severe mental impairment.  Frances Culbertson, PhD., affirmed the assessment on August 26, 2002.  (Tr. at 800.)

### B. Hearing Testimony

### 1. LeAnn Spahn

As alluded to in the medical records, in 1999 plaintiff took in her niece and nephew as foster children, later adopting the boy, and much of the testimony during the hearing on remand focused on plaintiff's child care responsibilities.  LeAnn Spahn, a licensed clinical

---

[3]The record contains additional medical records into 2007, which I have reviewed but do not specifically summarize in this decision.  (Tr. at 1121-63.)

social worker, testified that she provided in-home therapy to plaintiff's nephew Daniel from 1999 to 2003. (Tr. at 1233-36.) Spahn testified that often when she would arrive she would find plaintiff laying the couch, where she would remain throughout the session. Spahn further testified that at times plaintiff would be confused about the dates of their appointments. (Tr. at 1234.) Spahn also stated that plaintiff seemed to have trouble maintaining the house, which appeared very cluttered. Plaintiff told Spahn that she could not stay on top of things due to her low energy level. (Tr. at 1235.) The ALJ asked why, if the home was as Spahn described, the authorities permitted plaintiff to remain a foster parent. Spahn responded that the house was not dirty but rather cluttered and disorganized. (Tr. at 1237.) She described the clutter as covering every surface, such that things had to be pushed off to make a place to eat. In the hallways, there would be boxes of things that had not been put away. (Tr. at 1242.) Spahn indicated that plaintiff's husband expected plaintiff to maintain the house. (Tr. at 1244.)

### 2. Plaintiff

Plaintiff testified that to initially become a foster parent she took just a few, one or two hour classes, a total of about six hours. When she became re-certified in 2004, she took a thirty-six hour course. Her home was also inspected. (Tr. at 1248-49.) For a time plaintiff also cared for Daniel's sister, Beth, but Beth was removed after less than a year due to behavioral problems. (Tr. at 1239; 1249.) Plaintiff was primarily responsible for the children, as well as shopping and maintaining the house; her husband apparently did little. (Tr. at 1251.)

Plaintiff testified that she could not work full-time, even in a sedentary position such as the poison control job. (Tr. at 1253-54.) She testified that she tried to work more hours

17

when she first started the job, up to about thirty per week, but discovered that she could not maintain such a schedule due to fatigue. (Tr. at 1255.)

### 3. VE

The VE, Ronald Raketti, testified that plaintiff's past work as a nurse was medium, skilled work. (Tr. at 1262.) The ALJ then asked hypothetical questions, assuming a person age forty-four, with a twelfth grade education, and work history like plaintiff's. If the person were limited to sedentary work, with no climbing, kneeling, crawling, balancing or working at heights or hazards, and no exposure to extreme heat; with occasional stooping, crouching and twisting of the neck; and mentally limited to routine, repetitive, simple, non-complex work, plaintiff's past work could not be done. (Tr. at 1263.) Other jobs could be done, however, including order filler, information clerk and assembler. (Tr. at 1263.) If the person needed to alternate positions from sitting to standing as needed, the assembler job would be eliminated would the other two would remain. (Tr. at 1264.)

### C. ALJ's 2007 Decision

Following the five-step process, the ALJ first determined that plaintiff had engaged in SGA since her alleged onset date, having returned to work at Children's Hospital in December 2002. The ALJ thus found plaintiff ineligible for benefits thereafter. She then proceeded to consider the period prior to December 2002.[4] (Tr. at 1172-73.)

_____

[4]Later in her decision, the ALJ stated: "Medical opinions from Dr. Terry and Dr. Swanson indicated that claimant's condition improved or at least did not significantly worsen and since December 2002, claimant has been able to work at the substantial gainful activity level." (Tr. at 1178.) Plaintiff states that this implies that she could not perform SGA prior to December 2002, which might make a closed period appropriate. However, the ALJ went on to find that plaintiff was not disabled at any time from October 15, 1998, through the date of the decision. (Tr. at 1180.) And as the Commissioner notes, the ALJ's step one finding regarding the post-December 2002 period was based on plaintiff's earnings, not on medical improvement.

18

The ALJ determined that during that period plaintiff suffered from severe impairments, including MS, optic neuritis, asthma, migraine headaches, depression and low back pain, none of which met or equaled a Listing. (Tr. at 1173.) The ALJ then found that prior to December 2002, plaintiff retained the RFC for unskilled, simple, sedentary work requiring lifting or carrying no more than 10 pounds occasionally, and 10 pounds or less frequently, sitting up to 6 hours per day and walking up to 2 hours per day. The ALJ further determined that plaintiff required the ability to alternate between sitting and standing, with no climbing, balancing, overhead reaching or exposure to hazards, and only occasional stooping or twisting of the neck. (Tr. at 1175.) In so finding, the ALJ noted that this RFC was more restrictive than reflected in the FCE performed in November 1999, as well as the opinions of Dr. Braza and the state agency consultants. (Tr. at 1176.)

The ALJ found plaintiff's testimony not credible to the extent she claimed inability to work full-time at the sedentary work. The ALJ noted that plaintiff performed household tasks, cared for foster children, and took graduate classes between April 2000 and May 2001. (Tr. at 116-777.) The ALJ further stated that the medical records since plaintiff's hospitalization in November 1998 showed a fairly steady, if not uninterrupted, trend toward improvement, especially after her medications were adjusted. (Tr. at 1177.) The ALJ quoted several entries in Dr. Terry's records noting plaintiff to be doing well with little fatigue. (Tr. at 1177-78.) The ALJ also rejected the reports from Dr. Novom and Dr. Kori-Graf finding that plaintiff could not work full-time. (Tr. at 1178-79.) She said nothing about Dr. Terry's 2004 report.

The ALJ determined that based on her RFC plaintiff could not return to past work, performed at the medium level, but, relying on the VE, that she could perform other jobs

19

such as order filler, information clerk and assembler.  (TR. at 1179-80.)  The ALJ thus

determined that plaintiff was not under a disability at any point through the date of her

decision.  (Tr. at 1180.)

### III.  DISCUSSION

**A.      Evaluation of Medical Opinions**

**1.      Legal Standard**

Under SSA Regulations, the ALJ must consider all medical opinions in the record,

but the method of evaluation varies depending on the source.  Medical opinions from a

treating physician (a/k/a "treating source")[5] about the nature and severity of the claimant's

impairments are entitled to "special significance" and will, if well-supported by medically

acceptable clinical and laboratory diagnostic techniques and not inconsistent with other

substantial evidence in the case record, be given "controlling weight."  SSR 96-8p.  If the

ALJ finds that a treating source opinion does not meet the standard for controlling weight,

she must evaluate the opinion's weight by considering a variety of factors, including the

length, nature and extent of the claimant and physician's treatment relationship; the degree

_____

[5]"Treating source means your own physician, psychologist, or other acceptable medical
source who provides you, or has provided you, with medical treatment or evaluation and who
has, or has had, an ongoing treatment relationship with you. Generally, we will consider that
you have an ongoing treatment relationship with an acceptable medical source when the
medical evidence establishes that you see, or have seen, the source with a frequency
consistent with accepted medical practice for the type of treatment and/or evaluation required
for your medical condition(s). We may consider an acceptable medical source who has treated
or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your
treating source if the nature and frequency of the treatment or evaluation is typical for your
condition(s). We will not consider an acceptable medical source to be your treating source if
your relationship with the source is not based on your medical need for treatment or evaluation,
but solely on your need to obtain a report in support of your claim for disability. In such a case,
we will consider the acceptable medical source to be a nontreating source." 20 C.F.R. §
404.1502.

20

to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d); SSR 96-2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always "give good reasons" for her decision. 20 C.F.R. § 404.1527(d)(2).

If a medical provider who personally examined the claimant does not qualify as a treating source, whose report may receive controlling weight, s/he will nevertheless be considered an "examining source," whose opinion is generally entitled to more weight than that of a provider who did not personally see the claimant. 20 C.F.R. § 416.927(d)(1)); see also Criner v. Barnhart, 208 F. Supp. 2d 937, 953 (N. D.Ill. 2002) (citing Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982); Allen v. Weinberger, 552 F.2d 781, 786 (7th Cir. 1977)). Finally, the reports of non-examining or consultative sources must also be considered, 20 C.F.R. § 416.927(f), although such opinions do not, by themselves, constitute substantial evidence sufficient to justify the rejection of a treating physician's opinion, Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

**2.    Analysis**

Plaintiff argues that the ALJ erred in rejecting the opinions of treating source Dr. Kori-Graf and examining source Dr. Novom, and ignoring the May 2004 report from treating source Dr. Terry. Plaintiff further notes that the ALJ in her 2007 decision essentially re-states some of the reasons she provided in her 2004 decision, which the court previously found insufficient.

21

### a. Dr. Kori-Graf

As indicated above, in her November 2003 report Dr. Kori-Graf opined, <u>inter alia</u>, that plaintiff was limited to part-time work, and that she would likely be absent more than four times per month due to her symptoms.  (Tr. at 816-18.)  In her 2004 decision, the ALJ rejected Dr. Kori-Graf's report because the doctor had, at the time, examined plaintiff just once and thus lacked a "longitudinal history" with plaintiff, and the doctor failed to set forth the "objective evidence she used as a basis for her opinion."  (Tr. at 27; 991.)  The ALJ also stated that Dr. Kori-Graf's report, as well as Dr. Novom's, conflicted with plaintiff's activities during the time period at issue.  (Tr. at 27; 992.)

In the 2007 decision, the ALJ again rejected Dr. Kori-Graf's report, stating that the doctor "did not set forth objective findings" to support her conclusion that plaintiff could not work full-time.  (Tr. at 1179.)  The ALJ also stated that Dr. Kori-Graf's report contained internal contradictions.  Specifically, Dr. Kori-Graf idicated that plaintiff "reported no exacerbations of multiple sclerosis during the prior year, nor did [plaintiff] have significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity involved by the multiple sclerosis process."  (Tr. at 1179.)  Dr. Kori-Graf also stated that plaintiff "rarely" experienced fatigue, pain or other symptoms severe enough to interfere with attention and concentration, and did not have "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross motor and dexterous movement or gait and station."  (Tr. at 1179.)  Although she did not directly link it to her rejection of Dr. Kori-Graf's report, the ALJ also noted, earlier in her decision, that the RFC she adopted was more generous than the findings of several physicians who examined plaintiff, including the results of the November 1999 FCE and the

22

opinion of Dr. Braza, plaintiff's rehabilitation specialist, as well as the reports of the state agency consultants.  (Tr at 1176.)

These reasons do not withstand scrutiny.  While an ALJ may reject an opinion lacking objective medical support in the record, she may not consider the record in a cramped fashion, citing only evidence in support of her conclusion and ignoring evidence to the contrary.  See Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003).  In the present case, the record contains significant evidence supporting Dr. Kori-Graf's report, which the ALJ failed to consider.  Most importantly, in April 2004, Dr. Terry, plaintiff's long-time treating physician, wrote:

> Ever since the MS exacerbation in 1998, Ms. Sucharski has had moderate to severe fatigue with brief episodes of mild to moderate fatigue.  To my knowledge she has never been free of fatigue from this disease.  I have tried to ease her back into a part-time working condition where she would be sitting most of the time.  She was never able to tolerate a full 40 hour per week position at any form of employment.

(Tr. at 873.)  The ALJ said nothing about this report, or about Dr. Terry's May 20, 2003 treatment note, in which he limited plaintiff to working up to two days in a row and no more than 2 ½ days per week.  (Tr. at 836.)  Nor did the ALJ discuss the examination findings

23

set forth in the treatment note relating to plaintiff's October 31, 2003 visit with Dr. Kori-Graf.[6] (Tr. at 832-33.)

The ALJ noted Dr. Kori-Graf's statement that plaintiff experienced no exacerbations of multiple sclerosis during the prior year, but Dr. Terry's April 2004 report also addresses this issue, noting that plaintiff's fatigue had been a constant problem since 1998. Dr. Terry also explained that while plaintiff initially presented with a "form of MS called relapsing-remitting wherein between exacerbations she was relatively stable," she later "converted to what we call secondary progressive MS manifested [by] a continuous downhill course with increasing symptoms, fatigue and cognitive problems that prevent her from working for any degree of time. This is a chronic progressive condition in which she will continue to deteriorate over time." (Tr. at 873.) This report, which Dr. Terry based on a review of medical records from 1998 to 2003, refutes the ALJ's statement that the treatment records, post-1998, "showed a fairly steady, if not uninterrupted, trend toward improvement." (Tr. at 1177.)[7]

---

[6]The Commissioner states that because the ALJ found plaintiff not disabled after December 2002 based on earnings, she reasonably did not consider medical evidence from that period of time. But the cases hold that an ALJ may not ignore evidence simply because it post-dates the period under consideration. See, e.g., Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."); Blom v. Barnhart, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) ("[T]he ALJ must consider evidence that post-dates the relevant period to the extent that it corroborates or supports the evidence from the relevant period."). In this case, Dr. Terry was plaintiff's treating physician from 1998 to 2003, and thus well positioned to offer an opinion on her ability to function during the relevant time.

[7]While at times plaintiff reported doing well with less fatigue, a fair summary of the records does not support the notion that plaintiff improved over time. For example, on October 19, 1999, despite decreased fatigue, plaintiff reported inability to work full-time. (Tr. at 589.) In February 2000, plaintiff reported more energy after another course of intravenous steroids,

24

It is true, as the ALJ noted, that Dr. Kori-Graf checked "no" when asked about "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity involved by the multiple sclerosis process" and "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross motor and dexterous movement or gait and station." (Tr. at 1179.) But these questions pertained to whether plaintiff met the MS Listing, see 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.09, a claim she does not make. The ALJ failed to explain why the absence of these symptoms cast doubt on Dr. Kori-Graf's opinion as to plaintiff's functional limitations.

Finally, the ALJ noted Dr. Kori-Graf's opinion that plaintiff "rarely" experienced fatigue, pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. at 1179.) However, the ALJ failed to explain how this denigrates Dr. Kori-Graf's opinion that plaintiff was physically unable to work full-time. The Commissioner notes that plaintiff's current job as a poison control hotline nurse presumably involves stressful and complex work, but this again ignores the fact that plaintiff performs this job on a part-time basis. Neither the ALJ or the Commissioner address Dr. Terry's note in which he discusses plaintiff's inability to perform

_____

but still fatigued easily. (Tr. at 584.) On August 29, 2000, Dr. Terry advised plaintiff to reduce her academic load due to fatigue. (Tr. at 581.) On October 31, 2000, Dr. Terry noted that while plaintiff experienced some relief after steroid treatment, she continued to show slow progression of her MS symptoms. (Tr. at 580.) On June 24, 2001, plaintiff reported increased fatigue with only mild exertion. (Tr. at 574.) Plaintiff reported doing well in December 2001 (Tr. at 781), but in February 2002 she complained of increased fatigue and spasticity. (Tr. at 791.) On June 11, 2002, she again complained of fatigue. (Tr. at 789.) On February 19, 2003, plaintiff reported doing quite well after returning to work, but Dr. Terry nevertheless cautioned that she still had MS. (Tr. at 840.) Unsurprisingly, by May 2003 Dr. Terry was forced to significantly limit plaintiff's part-time hours. (Tr. at 836-37.)

this job on a full-time, sustained basis. (Tr. at 836.) The Commissioner attempts to marshal further support for the ALJ's decision on this issue, but "principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [judicial] review to the reasons supplied by the ALJ." Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).

> **b.    Dr. Novom**

As noted above, in his June 6, 2001 report Dr. Novom opined, inter alia, that plaintiff was limited to part-time, sedentary work. (Tr. at 824.) In her 2004 decision, the ALJ rejected this report because Dr. Novom was hired by plaintiff's former employer to conduct an independent medical evaluation and based his opinion on just one exam, and the report was contrary to Dr. Terry's findings just one month earlier when plaintiff's neurological results were "normal." (Tr. at 27.) As the court found during the first round of judicial review, these reasons were flawed. The June 6, 2001 report followed Dr. Novom's third examination of plaintiff, and Dr. Terry's May 15, 2001 note stated that plaintiff's neurological exam showed "no change," not that it was "normal." (Tr. at 575; 997.) The May 15, 2001 note further indicated that plaintiff complained of "new symptoms," including leg pain and swelling, increased word-finding problems, decreased short-term memory, occasional overflow incontinence and spasms to the hands. (Tr. at 575.)

In the 2007 decision, the ALJ again rejected Dr. Novom's June 2001 report, this time because Dr. Novom did not have the benefit of knowing plaintiff's medical history, including the clinical findings made by Dr. Terry from November 1998 through May 2001, and he did not have the test results from Dr. Swanson. The ALJ further stated that Dr. Novom's opinion, "at the very least, was contradicted by the findings of other treating physicians,

26

which in turn were supported by other evidence in the record." Again, the decision cannot stand on this basis.

Contrary to the ALJ's statement, Dr. Novom's three reports reflect a thorough review of the medical records, including at least some of Dr. Terry's notes. (Tr. at 393; 448-50; 821.) Moreover, the ALJ failed to explain the conflict between Dr. Terry's notes and Dr. Novom's report.[8] Nor, as discussed above, did the ALJ address Dr. Terry's April 2004 report, in which Dr. Terry also found plaintiff limited to part-time work due to fatigue (Tr. at 873), or the May 20, 2003 treatment note in which Dr. Terry limited plaintiff to working up to two days in a row and no more than 2 ½ days per week (Tr. at 836).

Nor can Dr. Novom's report legitimately be questioned based on Dr. Swanson's test results. Dr. Swanson found plaintiff to be functioning well cognitively in March 1999 (Tr. at 410), with relatively little cognitive change on repeat testing in December 2001 (Tr. at 721-22).[9] But Dr. Swanson offered no opinion on whether plaintiff possessed the <u>physical</u> stamina for work. Indeed, she specifically noted that "pain and fatigue may be disabling irrespective of the results of cognitive testing. The degree to which [plaintiff] is disabled due to physical problems, fatigue, and pain would need to be documented by her neurologist, Dr. L. Cass Terry, MD, PhD." (Tr. at 736.) Dr. Terry authorized part-time work only.

––––––––––––––––––––

[8]As indicated above, the ALJ picked out certain quotes from Dr. Terry's notes where plaintiff was noted to be doing well with limited fatigue. But the records as a whole support Dr. Terry's finding that plaintiff was never free of fatigue, and that her condition slowly deteriorated. <u>See</u> n.7, <u>supra</u>.

[9]Dr. Swanson did note a decrease in manual dexterity, possibly representing a progression of MS. (Tr. at 722.)

27

Finally, the ALJ failed to specify which "other treating physicians" offered contrary opinions. See Briscoe, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."). Perhaps the ALJ meant Dr. Braza; as indicated earlier in the ALJ's decision, on September 20, 1999, Dr. Braza cleared plaintiff to return to full-time, light duty work following her cervical spinal surgery. (Tr. at 390; 589; 1174.) But the ALJ failed to appreciate that Dr. Braza treated plaintiff's cervical condition only, and nothing in the record suggests that she also considered plaintiff's MS in setting work limitations. (See Tr. at 390.)[10]

The Commissioner notes that the ALJ also cited plaintiff's November 1999 FCE, which found an ability for light work. However, this evaluation lasted just 2 ½ hours (Tr. at 747) and thus does not speak to plaintiff's ability to work full-time. According to the Commissioner, the report indicates that, so long as postural interruptions are permitted, plaintiff could sit for eight hours in an eight hour work day. However, this was based on an estimate, not actual testing. (Tr. at 751).[11]

As the Commissioner notes, the ALJ also mentioned the state agency consultants, who found plaintiff capable of full-time, light work. (Tr. at 1176.) However, the ALJ did not specifically credit those check-box reports, and in any event, the reports of non-examining

_____

[10]Dr. Novom, a neurologic specialist (Tr. at 454), reviewed Dr. Braza's report (Tr. at 821) and found it unrealistic that plaintiff could work at the light level given her MS symptoms (Tr. at 823-24).

[11]I also note that this evaluation was performed by a therapist, and the report was not signed by a physician. (Tr. at 756.) Thus, although the ALJ cited this evidence, it does not support her reference to "other treating physicians."

28

consultants alone are insufficient to justify rejection of treating source opinions. <u>Gudgel</u>, 345 F.3d at 470. As with Dr. Kori-Graf's opinion, the Commissioner offers additional, post-hoc reasons for rejecting Dr. Novom's opinion, but I may not affirm on that basis. <u>See</u> <u>Steele</u>, 290 F.3d at 942.

**B.    Credibility**

**1.    Legal Standard**

SSR 96-7p establishes a two-step process for evaluating a claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. SSR 96-7p.

Second, if an underlying impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit the claimant's ability to work. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96-7p. The "ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." <u>Knight v. Chater</u>, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with the claimant's daily activities; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication

29

the claimant takes; treatment other than medication; any other measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. While the ALJ need not discuss all of these factors in checklist fashion, she must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. Windus v. Barnhart, 345 F. Supp. 2d 928, 946 (E.D. Wis. 2004).

Because of the ALJ's superior access to the witnesses, a reviewing court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003). However, where the credibility determination is based upon objective factors rather than subjective considerations, the court has greater freedom to review the ALJ's decision. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). The court may also reverse where the ALJ fails to comply with SSR 96-7p, including its requirement that the ALJ provide specific reasons for the determination. See, e.g., Lopez, 336 F.3d at 539-40; Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003); see also Myles v. Astrue, No. 08-2908, 2009 WL 2870616, at *3 (7th Cir. Sept. 9, 2009) ("We will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009). But the ALJ may not simply ignore evidence.").

### 2.    Analysis

The ALJ rejected plaintiff's "allegations to the extent she argues that her fatigue rendered her unfit to perform any gainful employment." (Tr. at 1176.) In support of this conclusion, the ALJ pointed to several alleged "inconsistencies" in plaintiff's testimony. (Tr.

30

at 1176.)  The ALJ first noted that plaintiff's "husband relied on her to perform the primary daily household chores including the cooking, cleaning, shopping, and the child care duties for their foster children Daniel and Daniel's sister without regard for the difficulties she had associated with her fatigue."  (Tr. at 1176.)  This sounds more like a criticism of plaintiff's husband than a comment on plaintiff's credibility.  Moreover, the ALJ failed to explain how these daily activities conflicted with plaintiff's claimed inability to work full-time.  As the Seventh Circuit has repeatedly cautioned, an ALJ should not place

> undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home. . . . The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work.

Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006); see also Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009) ("Although [the ALJ] briefly described Villano's testimony about her daily activities, he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed.").  Finally, the ALJ failed to address the testimony that plaintiff could not stay on top of her household chores due to fatigue.  (Tr. at 1235.)  See Moss, 555 F.3d at 562 ("An ALJ cannot disregard a claimant's limitations in performing household activities.").

The ALJ noted that plaintiff cared for foster children, which included taking them to appointments and attending classes, again with minimal help from her husband.[12]  (Tr. at 1176.)  This, the ALJ claimed, demonstrated that plaintiff "is able to be quite functional

_____

[12]The ALJ referred to plaintiff's "two foster children" (Tr. at 1176), but it is undisputed that plaintiff gave up Daniel's sister, Beth, after less than one year when Beth became unmanageable.  (Tr. at 1249.)

31

when she exerts the effort required by the legal standards that must be followed in this case, i.e., what is the most she can do despite her impairments." (Tr. at 1177.)  The ALJ acknowledged Leann Spahn's testimony that plaintiff's house was "cluttered," but noted that child welfare authorities never found plaintiff unfit or physically incapable of caring for the kids during routine inspections.  (Tr. at 1176.)

The record contains no evidence as to "the State's licensing requirements" for foster care (Tr. at 1176), permitting an inference that plaintiff could, if she met such requirements, also work full-time.  Further, as the Seventh Circuit has explained, the ability to care for children does not equate to the ability to work full-time outside the home.  Gentle v. Barnhart, 430 F.3d 865, 867-68 (7th Cir. 2005).  It is also worth noting that Daniel is plaintiff's nephew (Tr. at 1235), and she originally took him in under a temporary "kinship" care program (Tr. at 1247), with the understanding that he would be returned to his parents (Tr. at 1252).  When the parents proved unable to take the children back, plaintiff decided to adopt Daniel rather than have him remain in a "perpetual pre-adoptive state."  (Tr. at 1252-53.)  Plaintiff further testified that she put Daniel's needs first, despite her problems, because "that's part of having a child."  (Tr. at 1253.)  See Gentle, 430 F.3d at 867 ("Gentle must take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").  Finally, in response to the ALJ's questions about plaintiff's fitness, Spahn explained that while plaintiff's house was cluttered, it was not dirty, and plaintiff had some assistance from other family members.  (Tr. at 1237-38.)  Thus, the fact that Spahn made no reports that plaintiff was unfit does not reasonably cast doubt on her or plaintiff's testimony.

32

Finally, the ALJ noted that plaintiff studied at the Keller Management School of Business, completing four classes between April 2000 and May 2001.[13]  (Tr. at 1177.) However, the ALJ failed to appreciate that this was part-time course work (3 ½ hours per week in class), and that plaintiff proved unable to handle even that.  (Tr. at 819.)  See also 20 C.F.R. § 404.1572(c) (providing that activities like school attendance are generally not considered substantial gainful activity).

The Commissioner argues that plaintiff's willingness to take on the challenge of caring for two difficult foster children, while attending graduate school, in 2000-01, and then returning to rather challenging work in December 2002, casts doubt on her allegations of disabling fatigue.  But the record shows that plaintiff had difficulty caring for even one foster child, she could not complete her studies, and her efforts to increase her hours as a poison control hotline nurse failed.  This evidence shows, not that plaintiff was capable of full-time work, but that she continued to try to push herself to do more than she could physically handle.  In his June 2001 report, Dr. Novom found "commendable" plaintiff's desire to try to return to work but opined that she "is more disabled/impaired than which she is presently willing to admit."  He therefore recommended part-time, sedentary work only.  (Tr. at 823-24.)

**C.      Conclusion: 1998-2002 Period**

Because she failed to properly consider the reports of the treating and examining physicians, who unanimously concluded that plaintiff could not work full-time due to fatigue, and improperly rejected the testimony confirming that fatigue, the ALJ's decision must he

---

[13]It appears that the ALJ cited this evidence primarily to rebut plaintiff's claim of cognitive limitations.

reversed. The only remaining medical evidence standing against the conclusion that plaintiff was disabled from October 1998 to December 2002 is Dr. Braza's September 1999 report, and the check-box reports from the non-examining state agency consultants. As explained above, Dr. Braza said nothing about plaintiff's MS, making it unreasonable to rely on her report to conclude that plaintiff could work full-time. And as the Seventh Circuit has held, the "contradictory opinion of a non-examining physician does not, by itself, suffice" to reject a treating source report.[14] Gudgel, 345 F.3d at 470.

This application has been pending for eight years, the evidence in the case is not likely to change, and remand for further proceedings would serve no useful purpose. The matter has been remanded once under sentence four already, and the ALJ has yet to produce a reasoned decision.[15] See Wilder, 153 F.3d at 804. The evidence of record, properly evaluated, supports but one reasonable conclusion. Therefore, I will remand the matter with instructions that the application be granted.[16] See Elder v. Astrue, 529 F.3d 408, 414 (7th Cir. 2008) (citing Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000)

---

[14]I also note that Drs. Terry, Kori-Graf and Novom are all specialists in neurology and thus well qualified to render opinions on the effects of plaintiff's MS. So far as the record shows, the state agency consultants, in addition to not having examined plaintiff, have no such specialty. See Hopkins v. Commissioner of Social Sec., No. 1:07-cv-964, 2009 WL 1360222, at *17-18 (S.D. Ohio May 14, 2009) (remanding for award of benefits where the ALJ rejected the report of the plaintiff's treating neurologist in favor of a non-examining internist).

[15]It has also been remanded under sentence six.

[16]Plaintiff also argues that the ALJ failed to make a proper mental RFC determination. Although she made her ability to concentrate an issue, plaintiff's primary contention in this case has been that she lacks the stamina for full-time work. Because the ALJ's decision must be reversed for the reasons set forth in the text, I need not address this argument.

34

(explaining that, under SSR 96-8p, ability to work only part-time mandates disability finding); <u>Kelley v. Apfel</u>, 185 F.3d 1211, 1214-15 (11th Cir. 1999) (same)).

**D.    Trial Work Period**

Plaintiff argues that the ALJ erred in denying her claim at step one (post-December 2002), rather than applying the trial work period regulation, 20 C.F.R. § 404.1592.  The Commissioner argues that the issue is moot because that regulation applies only if the claimant is first found disabled.  Having made that finding, I will remand for application of § 404.1592.[17]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** with instructions that the Commissioner grant plaintiff's application for benefits from the period of October 15, 1998 to December 2002, and apply the trial work regulation thereafter.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2009.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[17]Plaintiff concedes that she is ineligible for benefits after November 2003, however, benefits would end due to work activity, not medical improvement.